Good morning, Your Honors. Good morning. May it please the Court, in recognizing I'll have to keep track of my own time, I am going to ask to reserve nine minutes for rebuttal. This is an interesting case. Could you identify yourself? Yes, I'm sorry. Pamela Johnston, Foley and Lardner for Mr. Gowrish, appellant. This is an interesting case that presents an accumulation of errors, we believe, that deprived Mr. Gowrish of due process. First, there was the situation where the key person who the SEC relied upon for the most incriminating evidence, they believed, actually was a cognitively disabled veteran, that the evidence that was presented to the jury was actually inaccurate, and it led to a situation where the jury was relying upon evidence that was wrong, and it's more serious. He was not 50 percent cognitively disabled. As the records have developed, he was actually 70 percent cognitively disabled, something that, one, the jury should have known, and, two, for the judge to have denied access, albeit it was a late request, but the SEC objected to it. Why was it a late request? I don't know, Your Honor. I don't know. I assume it was there. The rules were pretty clear on discovery, so. Nevertheless, it was their key witness, and the SEC blocked access, and the judge It's a blocked access? It's a file, Your Honor. I mean, late discovery that wouldn't have required any depositions. It's simply a file that could have been produced at the last minute. It would have been produced during the whole time of discovery had it been requested. Agreed. Although it did take a court order to get it, because of the nature of the privacy loss for the veterans. So it is a little bit different than your average piece of discovery, but it wasn't And then you ultimately got it by trial. Got it by the time of the penalty phase. I'm sorry, yeah. You're right. Yes, Your Honor. And the judge considered it. And the judge considered it at that point. That's correct. So for purposes of the penalty phase, it was considered. For purposes of the trial before the jury, there was unfortunately false testimony placed before the jury, because both the witness and the lawyers didn't know that he was more disabled than he could himself describe. He described his own disability as 50 percent cognitively disabled, but 100 percent unemployed. What the later records show is that that 50 percent was inaccurate. That was true in 2004. That was no longer true in 2010. So you have a witness, again, central witness, who is being asked to describe things and remember things when he has an impairment that makes it so it's hard for him to remember things. The memory is one of the issues that's identified in the file. It's where he has a severe, severe impairment. You would have thought that would have been at the top of the discovery request. So I can't disagree, Your Honor. All I can say is it didn't happen like that, and then we end up with this compounding error where false information is placed before the jury. It really is false, Your Honor. The difference between 50 percent and 70 percent is material. In terms of a second due process concern is the eliciting right at the beginning of Mr. Zaman's testimony of where he lives. He lives in Federal prison. That's elicited from the SEC. And then his guilty plea is put before the jury. It's awfully hard to have a trial where someone hears that one of the other people that's key to the case has said they pled guilty and they're in Federal prison. That stacked the deck in a way that really wasn't relevant and it was unfair. Now, it wasn't objected to, and so we're on plain error on this issue, I recognize. Well, I think probably you might want to address the intent, the scientific intent of this case. Absolutely, Your Honor. So moving past due process on to the issue of this Court having to make a decision with regard to what is the right jury instruction, this Court has not made that decision yet. And if we were looking at this issue and thinking about how, as we look at this issue, decide how to frame an intent for an insider trading case, I think the place to start is really the words of the statute itself. The words of the statute require in that prong of Section 10 and then Rule 10b-5 that it must be a deception or a manipulation. And to advise a jury how to grapple with that, how to find the right facts that show that it's a deception and a manipulation should be an intent that embraces that.  So I think that's a good way to start, but I don't think it's a good way to start with this case alone if the Court were to address it and not find recklessness to be sufficient. That's correct. Recklessness is appropriate, I think, for something which is a false statement. So if you have somebody submitting a false statement, if you, you know, typically even in the criminal context, and knowingly is enough in criminal, recklessly is sort of a version of knowingly. It's a standard which is a little bit below knowingly. But the way this instruction was crafted, it made it so that the person didn't actually have to know. It was a should-know standard. So it was a little bit low, especially when you're talking about something which is insider trading. The person should have to know that they're in an insider trading scheme. The person should have to, the jury instruction should tell the jury that they have to know that they're involved in something which is fraudulent. Hollinger, and I think it's Platform Wireless, seemed to make it clear that recklessness is sufficient for a 10b violation, I think, for a violation of Section 10b. And I understand that in this case this was a Rule 10b to 5b and not a – that these cases, the Platform cases involved 10b to 5b and not a 10b to 5a or c, as was in this case. But I'm trying to figure out why that matters. Okay. So if you're arguing, if you're trying to explain to a jury, somebody submitted a false statement. That's a typical – you could have an accounting case, for example, a false statement in an accounting case. That's what Platform Wireless is. It's about, it's a false statement. You can submit it if you know it's false, then you're responsible, you're liable for that conduct. When you are construing the portion of the statute which isn't about a submission of a false statement, but it's about employing a deceptive device or manipulation, that has a different footing. It's a footing that's more in the fraudulent, fraudulent conduct world. So, for example, you have to engage in a scheme. It doesn't require any false statement, but you know, you have to know that you're in something which is fraudulent. The way to discern that is through the mens rea or mental tent or, you know, as we call it in the civil world, scientry. So you need a deception. You need something where the fraudulent intent is clearly available. You can have something where you could be careless, and obviously reckless is a heightened form of carelessness, which is what the jury was told here. But you really want to know that when someone is providing information, that they appreciate that they are engaging in a deception and a manipulation of the stock market. Sotomayor And I guess I'm just trying to figure out why isn't recklessness sufficient for fraud. I mean ---- Sotomayor And I guess I'm just trying to figure out why isn't recklessness  I mean, if you look at the statute, whether it's criminal or civil, we would have just the difference of burden of proof, and then Section 78, I think it's FF, I'm doing it from memory, I'm sorry, Your Honor, but there's a willfulness required when you're having a conviction under the securities laws for insider trading or any other securities violation. So basically, the predicate could be a civil case, and then if you add willfully, it can be a criminal case. So the conduct is the same, though. We're talking about insider trading, something where someone is working within an organization, and they're talking about information, and the act of talking is itself not illegal. The act of talking about something which is material and nonpublic to someone that you think is going to trade, then that's when it becomes illegal. You could talk to the person down the hall. It's not illegal to talk about material, nonpublic information. It's when the person has an expectation that the other person they're providing the information to is going to go trade on the information. This is tricky, because it's really, you know, it's a form of speech that's being maybe illegal, which is perfectly permissible to have certain kinds of speech made illegal. But it needs to be obvious to the person who is speaking when he or she is making an error and has crossed the line over. Being reckless makes it so, by definition, you can't you don't actually know, because recklessness is an objective standard that says someone else thinks you went too far. In the person's own mind, recklessness does not require actual understanding of wrongful intent. Sotomayor, it just seems like in Hollinger and Platform Wireless, they both found that recklessness was sufficient. I mean, I think the details of the indictment about the fact that the person was going to be making an error, that was a recommendation to me, Section 10B's requirement, and that the activity be manipulative or deceptive. So I'm just trying to figure out how that's going to work. And maybe I'm remembering them incorrectly, but I thought they were false statement cases, Your Honor. I didn't think they were separate fraudulent scheme cases. I do make a distinction in my own mind. When you try those kind of cases, they're very different. You know, you attack them very differently. You don't have any one single false statement here. There's no – because there isn't a false statement. In fact, it's the opposite problem, right? It's truthful information that's being provided in a manner that's not appropriate. And so to discern when has someone crossed the line, you should be looking at what did the person understand at the time. And that's the problem with recklessness. It doesn't draw the right line, because it's not asking what did that person actually know. It's asking what should the person have known, what was obvious to the general public, if you will, what was obvious to others. Let me, before your time, I know you want to reserve some time for a rebuttal of 9 minutes. Thank you, Your Honor. It seems like the district court here appeared to be generous in imposing only a $100,000 fine. I don't disagree with that, Your Honor. When she could have imposed over a $1 million fine. It's more of a legal argument than a fairness argument. I know you're saying that the jury should have determined, I guess, that. But I just, you know, be careful what you ask for, because I think it was in Feltner. It went back to the jury, and they quadrupled. The jury quadrupled the fine. So I'm just curious as to how. Okay. I agree with that, and I've struggled a little bit in my own mind with that, as to, you know, be careful what you ask for. It's between the two remedies. I mean, the one is intellectually interesting about the Seventh Amendment, but I actually think that the other remedy is the one that the defendant is much more interested in. So in other words, the injunction is really the one that is going to have such an impact on his ability to make a living and the scope of his life. And so we spent a lot more time in the brief on the injunction, because it matters. And that's where, honestly, I believe that Judge Ilston – I have a lot of regard for Judge Ilston, but I hope she got that one right. Do you want to reserve the rest of your time? Yes, Your Honor, I would like to reserve the remainder of my time. Thank you. Thank you. Good morning. Your Honor, it's William Shirey for the Securities and Exchange Commission. You're absolutely correct. Hollinger controls this case. The Court in Hollinger looked at the language of Section 10b, the manipulative or deceptive device or contrivance, and concluded that the standard of recklessness that was first set forward in the Sunstrand decision, which Sunstrand referred to as the functional equivalent of intent, is sufficient to satisfy the SIEMTER standard under Section 10b. Every court of appeals that has stressed this issue has concluded so as well. Just in the past few months, the Second Circuit in Obas v. SEC reiterated yet again there in the context of an insider trading case that recklessness was sufficient. To the extent that Defendant Gowrish is arguing that somehow the rule, the three prongs of the rule, that there's a different SIEMTER standard involved there, I wanted to identify for the Court the fact that in Dean Rauscher, SEC – Dean – SEC v. Dean Rauscher, that was a case involving Section 17a of the Securities Act, which has three prongs that perfectly mirror the three prongs of 10b, Rule 10b-5. There, in looking at the three prongs, the Court – this Court determined that recklessness was sufficient for one prong, and indeed,  So to the extent that the Defendant is arguing somehow that the rule may actually impose a heightened standard, that's just not correct. With respect to the various alleged due process arguments, there's been no demonstration that there was an abuse of discretion, let alone in these instances, plain error. Unless the Court has questions about those, I have nothing to add. Finally, with respect to the permanent injunction and the civil penalty, we believe that the District Court was fully correct. Tull v. United States is directly on point. And as this Court recently said in U.S. v. Phillips, they are looking at an Apprendi issue in the forfeiture context, where there's a Supreme Court decision directly on point that controls. If there are no questions. Well, I just wanted to ask you to straighten out the record on the discovery. As I understand it, the defense did have documentation that – showing that the witness had a severe mental disability. Isn't that correct? Yeah, you're correct, Your Honor. The Commission had received, as part of our discovery, we had received materials from Mr. Vaghar. He's the individual who was alleged to have cognitive difficulties. The document we received indicated that under the Veterans Administration's rating system, he'd been rated with a 50% cognitive disability. That was provided during discovery to Defendant Gowrish. He had that during the cross – his counsel had that during cross-examination, asked Mr. Gowrish, as the District Court herself noted – District Court Judge noted, there was extensive discovery in part relying on that document. And Mr. Vaghar admitted that he had cognitive disabilities, that he wasn't sure of the exact percentage, but he thought 50% sounded right. There's one additional point, if you will indulge me for a second. To be sure, the subsequent materials that were turned over during the remedy stage that were received from the Veterans Administration indicated that the Veterans Administration had upped the disability determination for 50% to 70%. But I'd like to identify for the Court a March 19, 2009, letter from the Veterans Administration that actually was included in the sealed materials, Volume 2, page 278 of the sealed materials that were provided to the District Court at the remedy stage. They were not, for some reason, at least I'm not able to find them in the materials that were recently provided for the Court. But that letter from the Veterans Administration explains that the Veterans Administration has adopted a new rating criteria system, and that it, that may provide Mr. Gowrish, excuse me, Mr. Vaghar the ability to receive greater compensation under the newly refined criteria for assessing cognitive disabilities. But that by no means would, the letter actually says by no means would that mean that he actually had experienced any cognitive decline during that period. So at most there's a difference that due process violation is that they had information that he was 50% cognitively diminished, and the information would have said that he was 70. It would have been the delta, Your Honor. It's hard to believe that after hearing Mr. Vaghar testify, that hearing him say that he wasn't sure of the exact percent, but he felt 50% sounded reasonable, that somehow that coupled with the extraordinary lack of diligence on the part of Gowrish's trial counsel. Remember, in March, in March of 2009, I believe it was 2009, he identified, or excuse me, March 2010, he identified that Gowrish's counsel, that he wanted these materials, it's nine months later. I understand. I just wanted to make sure that the difference between what the information that they, that was brought out and what was in the file was the difference between 50% and 70% or something. That's correct, Your Honor. And without testimony, it's even hard to know what that means in light of the March 19, 2009 letter from the Veterans Administration. Even if the medical evidence was properly excluded during trial, why not allow a cross-examination of Mr. Vaghar during the remedy stage? Your Honor, that's a discretionary call for the trial judge at the remedy stage. She had heard two days, I believe, of testimony from Mr. Vaghar on all the rel to the extent there were any issues that flowed over to the remedy stage. She'd heard testimony about those from Mr. Vaghar. She had herself assessed his credibility. She had the documents before her from the Veterans Administration to review. And she just felt, I think, ultimately, that these materials would be cumulative at this point, that she had reached an assessment. Let me ask you about the injunction. I guess, what's the proper standard of review for the injunction? How do we square, I guess, the SEC cases, Fenn and is it Goldfield, that suggest an abuse of discretion with the more general cases cited by Mr. Gowers that suggest it's a mixed question of law and fact? Your Honor, Fenn is directly on point, and we believe that it sets forth the correct standard here. After a trial judge has heard weeks of testimony, she is in the best position to assess whether, or the district court is in the best position to assess whether, based on credibility and other factors, a reasonable probability exists of a future violation. That's exactly what the trial court judge did here. While we believe that abuse of discretion is appropriate, we believe that under any standard, the same conclusion would be arrived at, at least three of the five Fenn injunction, and the fact remains that in the materials that were provided to the district court during the remedy stage, Mr. Gowers asserted that he wants to join a broker-dealer, so he's going to be right back in the thick of the securities industry. And on the Seventh Amendment issue, is your position that toll is still a good law in light of Southern Union and Feltner? I'm sorry, Your Honor. I missed the first part of the question. On Seventh Amendment, the jury trial for the civil fine, you say that toll is still the law to look at. Toll is absolutely the law, Your Honor. Notwithstanding the fact that there have been developments in the Sixth Amendment arena where there are, of course, numerous heightened protections that exist for criminal or for convictions and for criminal defendants, this the Supreme Court has never conflated the Seventh Amendment and the Sixth Amendment. And toll is directly on point, and as this Court recently held in United States v. Phillips, where there is directly controlling precedent, that that should control. I would note that toll was very clear that it is sufficient for purposes of preserving the Seventh Amendment jury trial right that in a civil penalty action, the jury assess issues going to liability, for the judge to assess issues, factual issues going to the determination of the civil penalty. If there are no further questions, the Commission is prepared to rest. Thank you. Thank you. Thank you. Ms. Johnson. Thank you, Your Honor. Let me address that standard of review question. You know, if the Court is looking at questions of law, I mean, it should be a de novo standard. There are some factual questions. Certainly, the district court is entitled to deference on factual questions. But the application of those, you know, the very fundamental question, which is, you know, was the defendant about to engage in a securities violation, that fundamental question, I think this Court is equally able to decide as the district court was looking at the record here. The district court did not make, you know, factual findings, I think, that were particularly relevant to the injunction. I think the Court, in our view, misbalanced the factors. I mean, the first factor regarding the scienter, I think, is a good example of where the Court just didn't give the right take to it on the factors where she found it to be neutral. Neutral should not be for the SEC. The SEC has the burden of proof. And so if a factor is neutral, it should not weigh for an injunction. So if you have only a recklessness finding here in that particular scienter situation, you should not have an injunction issued absent something extraordinary happening. And certainly here, at the time of the hearing in July of 2011, it had been four years since the events at issue. That certainly is a circumstance. If that was, I guess I think of this case, if it was never this case, what case would call out for no injunction? This seems like the exact case of when there should be no injunction. Not every case should have an injunction. The statute certainly doesn't say if you have a violation, issue an injunction. It says either, you know, it's about to occur. That's the prong that's relevant here. So I think weighing those factors, this Court can do it just as well as the district court could. With regard to the issue of the Toll decision, I went back and read it again this morning, because I recognize Toll is going to be, you know, obviously an important decision for this Court to mull over. I'll bring you one fact that I hadn't noticed when I read it before, which is in that decision, that is a 10,000-a-day penalty. So it doesn't have any fact that has to be found. And that's what makes this one different. I agree, most civil penalties will not be in the situation of needing a factual enhanced fact to be found by the jury. Same situation with Apprendi. Most sentencings don't require an Apprendi finding, because there's ordinarily not a fact that's going to drive the statutory maximum. So we have the same situation here. We have an unusual statute, which is looking at what's the profit gained or the loss avoided. And then it asks, you know, you can go up to three times that. So this seems like the factual setting and the kind of statute that is analogous. We're not arguing that the Sixth Amendment applies, of course. We're arguing that the jury interpretation applicable in the Sixth Amendment should apply in the Seventh Amendment when you have a punitive measure, and the judge recognized what she was doing was punitive. I think we're going to find quite a bit. She did, Your Honor. She still recognized it was a very high civil penalty. Do you think a jury would be different? And part of that was based on ability to pay, Your Honor, so that was part of why it was reduced. Do you think a jury would come up with a different result? I don't know. I really don't, Your Honor. You know, I think the jury would have asked the question of did they think he got paid or didn't get paid, and if so, how much. And that would be the amount that would be relevant for, in my view, would be relevant. They could have come up with a higher amount. They could have come up with a higher amount. You're absolutely right. Yeah. So I don't think there was anything else I wanted to address. So I think that was it, Your Honor. Any other questions? No. Thank you very much. Thank you very much. All right. Thank you both for your arguments today. The case is submitted.
judges: Schroeder, Noonan, Murguia